UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PRECISION CONVERSIONS, LLC, *an Oregon company*, and 321 PRECISION CONVERSIONS, LLC, *an Oregon company*,

Plaintiffs,

v.

MAMMOTH FREIGHTERS, LLC, *a Delaware company*, WILLIAM J. WAGNER, *an individual*, and WAGNER AERONAUTICAL, INC., *a California corporation*,

Defendants.

Case No. 3:25-cv-01927-AR

**OPINION AND ORDER**

_____

**ARMISTEAD, United States Magistrate Judge**

This is a trade secret dispute between plaintiffs Precision Conversions, LLC and 321 Precision Conversions, LLC and defendants Mammoth Freighters, LLC, William Wagner, and Wagner Aeronautical, Inc. All parties are in the business of converting decommissioned passenger planes into cargo planes. Precision alleges that defendants have misappropriated tens of thousands of pages of trade secrets developed for two of Precision's aircraft conversion

projects.[1] Mammoth has moved to dismiss (ECF 39), and the Wagner defendants indicate their intent to move for dismissal as well. (ECF 60.) Defendants request a discovery stay pending resolution of those potentially dispositive motions. (ECF 43, 46.) For the reasons explained below, defendants' motion to stay discovery is GRANTED.

## BACKGROUND

### A.    *The Allegations*

The facts date back to the early 2000s, when Precision Conversions began working towards applying for its first Supplemental Type Certificate (STC) from the Federal Aviation Administration (FAA). STCs permit the certificate holder to convert decommissioned passenger planes into cargo planes, which extends the service life of the plane. Along with the STC, Precision also had to obtain approval to manufacture FAA-compliant parts for its converted planes, referred to as Parts Manufacturing Approval (PMA). Precision alleges that passenger-to-cargo plane conversion calls for over 11,000 parts, all of which must be designed, tested, and manufactured by Precision. (First Am. Compl. (FAC) ¶¶ 14-20, ECF 32.)

Unsurprisingly, the STC application process is highly technical, very expensive, and takes many years to complete. For instance, only a handful of companies hold STCs to convert the Boeing 757 and Airbus A321—Precision is one of them. Precision alleges that it took five years, tens of millions of dollars, and over 80 engineers to obtain the Boeing 757 STC. The Airbus A321 STC took another five years and cost nearly twice as much. (FAC ¶¶ 19, 22.)

---

[1]     Unless otherwise necessary for clarity, Precision Conversions and 321 Precision Conversions are referred to together as "Precision."

In 2001, when Precision set out to apply for the Boeing 757 STC, it had two members: Erickson Ventures LTD, which owned 99.935 percent of the company, and William Wagner, who owned 0.065 percent. Wagner operated in a Vice President role, and Precision contracted with Wagner's company, Wagner Aeronautical, to develop Precision's 757 conversion program, for which Precision alleges Wagner was the "lead engineer." (*Id.* ¶ 24.) Early on, Precision, Wagner, and Wagner Aeronautical entered into a "Development Agreement" in which, Precision asserts, Wagner and Wagner Aeronautical released their "entire right, title, and interest in and to the STC, the Conversion, and all proprietary rights therein, including, without limitation, all 'Data' and 'Precision Know-How'." (*Id.* ¶¶ 25-26.) Under the Development Agreement, all related intellectual property rights belonged to Precision, and Wagner was prohibited from disclosing any proprietary information without Precision's written approval. The Agreement granted Wagner a limited license to use certain "Precision Know How," as long as the "Know How" was maintained a trade secret. (*Id.* ¶¶ 26-31.)

But that limited license excluded the use of any "Data," as defined under the Agreement, that belonged to Precision. (*Id.* ¶ 30.) That "Data," Precision alleges, encompasses all of the information generated over the many years it took to develop the 757 conversion program and obtain the STC—"tens of thousands of pages of documents [and] testing data generated in qualifying thousands of specific airline parts for FAA approval." (*Id.* ¶ 35.) As alleged by Precision, that "compilation of information," as well as containing individual trade secrets, constitutes a trade secret in and of itself because it is both maintained as confidential and has substantial value. (*Id.*) Few companies hold STCs for passenger-to-cargo conversions, meaning

Page 3 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

those that do stand to earn large profits by either charging customers to convert an aircraft, or converting and selling the converted aircraft themselves. (*Id.* ¶ 37.)

Precision asserts that Wagner and Wagner Aeronautical signed a comprehensive confidentiality agreement in 2001 that covered Precision's "business affairs and all matters in which Precision has an interest." (*Id.* ¶ 43.) Employees and suppliers of Precision sign similar non-disclosure agreements, and any STC-related document is "routinely" marked as proprietary. (*Id.* ¶¶ 44-46.)

In 2013, 321 Precision was formed as an affiliate of Precision Conversions and began the process of applying for the Airbus A321 STC. For the same reasons articulated above, Precision asserts that all of the data developed during the Airbus A321 STC process are valuable trade secrets as well. (*Id.* ¶¶ 49-58.)

Wagner left Precision in 2006. (*Id.* ¶ 75.) In 2020, he co-founded defendant Mammoth Freighters. Mammoth is allegedly funded by a private equity group that has no previous experience in passenger-to-cargo plane conversions. Despite that, Mammoth intends to acquire an STC to convert Boeing 777s, one of the most expensive and labor-intensive STCs to secure—if it is successful, it will be just the second company in the world to do so. (*Id.* ¶¶ 59-65.)

According to Precision, Mammoth and Wagner Aeronautical entered into a Conversion Program Development Agreement in 2021, under which Wagner agreed to develop, maintain, and implement a Boeing 777 STC and provide related "engineering and technical support." (*Id.* ¶ 61.) Although not identical, Precision alleges that many of the processes, procedures, and technical elements of a 757 or Airbus conversion carry over to a 777 conversion. (*Id.* ¶ 63.)

Since forming in 2020, Mammoth has allegedly recruited at least 20 former Precision employees. (*Id.* ¶¶ 66-67.)

In 2023, Precision learned for the first time that Mammoth was allegedly in possession of a Precision trade secret—a Finite Element Model, or FEM, developed for its 757 conversion program.[2] (*Id.* ¶ 69.) Precision asserts that its 757 FEM took years to develop and involved acquiring, measuring, and testing an actual 757 aircraft. (*Id.* ¶ 39.) In the Development Agreement signed by Precision, Wagner, and Wagner Aeronautical, the 757 FEM is identified as part of the "Data" that Wagner had no license to retain or use. Precision alleges that, not only did Wagner improperly disclose the FEM to Mammoth, but Mammoth also misused the FEM to "approximate" a 777 aircraft. (*Id.* ¶¶ 70-72.)

Also in 2023, Wagner Aeronautical moved out of its offices in California. A former Precision employee, now working for Mammoth, contacted Precision and asked what should be done with "a room full" of Precision 757 data. (*Id.* ¶ 81.) Erickson, Precision's founder, asked Wagner to return the documents, but he never did so. (*Id.*)

Then, in 2025, a Precision employee "performing consulting services for Mammoth" allegedly found multiple documents belonging to Precision on Mammoth's internal database. (*Id.* ¶ 73.) Three of the discovered reports predate Wagner's separation from Precision, and all three were marked as proprietary. Precision alleges that those reports would be useful in the development of a 777 conversion. (*Id.* ¶¶ 74-78.) Precision also asserts that it discovered a 2024 email thread between two Mammoth employees in which a Mammoth engineer (incorrectly)

_____

[2]    In the aircraft conversion context, a FEM "is a computer model of an aircraft that, among other things, provides a virtual testing environment for contemplated changes." (FAC ¶ 39.)

explained that Mammoth could use all of the 757 data because "Precision and Wagner Aeronautics had a partnership of some kind." (*Id.* ¶ 79.)

In addition to alleging that Wagner unlawfully disclosed Precision's 757 data to Mammoth, who, in turn, unlawfully used that data to develop its own 777 conversion program, Precision also alleges that Mammoth has misappropriated trade secrets related to Precision's Airbus A321 STC through former Precision employees. To support that allegation, Precision asserts that one of Mammoth's solenoid blocks, developed for its 777 conversion program, bears a "striking resemblance" to a solenoid block with a novel sequencing structure developed for Precision's A321 conversion program. (*Id.* ¶¶ 82-84.) The Precision employee that designed that solenoid block now works at Mammoth. And Precision alleges that at least one document related to its A321 conversion program has been found on Mammoth's servers. (*Id.* ¶ 84.)

## B.    *The Complaint*

Precision Aircraft Solutions, LLC, the holding company for subsidiaries Precision Conversions and 321 Precision, sued Mammoth in October 2025. (ECF 1.) After Mammoth asserted in its first motion to dismiss that Precision Aircraft Solutions lacked standing to sue on behalf of its subsidiaries (ECF 22), Precision amended its complaint and added Precision Conversions and 321 Precision as plaintiffs and Wagner and Wagner Aeronautical, Inc. as defendants. (ECF 32.)

Against all defendants, Precision brings federal and state-law claims for misappropriation of trade secrets as well as a tort claim for conversion. Against Mammoth, Precision brings a claim of tortious interference. Against Wagner and Wagner Aeronautical, Precision brings a breach of contract claim. (*See generally*, FAC ¶¶ 94-136.) Precision seeks actual, compensatory,

Page 6 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

and punitive damages, injunctive relief, and for defendants to be held jointly and severally liable. (*Id.* at 27.)

Soon after Precision amended its complaint, the court granted its *ex parte* request for alternative service on Wagner and Wagner Aeronautical (ECF 40), as Wagner's only available address was at his alleged vacation home in Washington and the address of Wagner Aeronautical's registered agent in California was, according to the process server, closed and fenced up. (*See* Burnside Decl., Exs. 2, 4, ECF 37.) Wagner and Wagner Aeronautical's counsel filed an appearance in this case on February 12, 2026. (ECF 45.)

Mammoth again moved to dismiss on February 2, 2026 (ECF 39), on two bases: (1) Precision failed to sufficiently plead the trade secret and tort claims, and (2) the conversion and tortious interference claims are preempted by the Oregon Uniform Trade Secrets Act (OUTSA). The Wagner defendants have not moved to dismiss but intend to do so. (*See* ECFs 60, 61 (granting the Wagner defendants' motion for an extension of time to file a responsive pleading).)

**C.      *The Motion to Stay Discovery***

Since discovery opened in January, Precision has served Mammoth with 97 requests for production and subpoenaed 12 third parties. Those third parties include current Mammoth employees and lawyers that represented Mammoth in a previous trade secret case. (Mot. Stay (MTS) at 2-3; *see generally,* Nitz Decl., ECF 44.) Mammoth asserts that Precision's discovery requests are vague, overly broad, and unduly burdensome. (*Id.* at 1, 6.) During the Rule 16 conference with the court, Precision and Mammoth presented their opposing positions on a

potential stay of discovery pending resolution of Mammoth's motion to dismiss.[3] The court

asked for a formal motion from Mammoth on that issue and temporarily stayed the case in the

meantime. (ECF 42.) That motion is before the court. Wagner and Wagner Aeronautical join in

Mammoth's motion to stay; Precision opposes the motion.

### LEGAL STANDARD

There are no clear standards for determining whether a motion to stay discovery should

or should not be granted when a potentially dispositive motion is pending. *Ciuffitelli v. Deloitte*

*& Touche LLP*, 3:16-cv-0580-AC, 2016 WL 6963039, at *4 (D. Or. Nov. 28, 2016). Neither the

Federal Rules of Civil Procedure nor Ninth Circuit case law articulate a rule or a test that the

district court must apply. *Id.*; *Longhini v. Station Casinos, LLC*, 2:25-cv-01070-APG-BNW, 2025

WL 2986802, at *1 (D. Nev. Oct. 22, 2025). Even so, what is clear is that the filing of a

dispositive motion does not, by itself, justify a stay of discovery. The Federal Rules do not

mandate such a stay, and courts generally decline to grant a stay on that basis alone. *See, e.g.*,

*Tradebay LLC v. eBay, Inc.*, 278 F.R.D. 597, 603 (D. Nev. 2011) ("The fact that a non-frivolous

motion is pending is simply not enough to warrant a blanket stay of all discovery."); *Mlejnecky v.*

*Olympus Imaging Am., Inc.*, 2:10–cv–02630 JAM KJN, 2011 WL 489743, at *5–6 (E. D. Cal.

Feb.7, 2011) (federal rules do not provide for discovery stay pending potentially dispositive

motion); *Turner Broadcasting System, Inc. v. Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev.

1997) ("[A] pending Motion to Dismiss is not ordinarily a situation that in and of itself would

warrant a stay of discovery.") (quoting *Twin City Fire Ins. v. Employers Insurance of Wausau*,

---

[3]    At the time of the conference, the Wagner defendants had not yet appeared and therefore
did not attend.

124 F.R.D. 652, 653 (D. Nev. 1989)); *Skellerup Indus. Ltd. v. City of Los Angeles*, 163 F.R.D. 598, 600–01 (CD. Cal. 1995) ("Had the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) would stay discovery, the Rules would contain a provision for that effect.").

Whether to grant or deny a motion to stay falls, then, within the court's broad discretion to control discovery. *See Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). And even without a clear test, the Ninth Circuit has provided some guideposts for determining whether staying discovery is appropriate against the backdrop of a pending dispositive motion. *Ciuffitelli*, 2016 WL 6963039, at *4. As outlined in *Ciuffitelli*, a discovery stay is appropriate if the district court is confident that the plaintiff will be unable to plausibly allege a viable claim for relief. *Wood v. McEwen*, 644 F.2d 797, 801 (9th Cir. 1981) (district court may "stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief"). A stay may also be appropriate if the pending dispositive motion raises procedural, rather than factual issues. *See, e.g.*, *Jarvis v. Regan*, 833 F.2d 149, 155 (9th Cir. 1987) (district court did not abuse discretion in denying discovery when the complaint did not raise factual issues requiring discovery to resolve); *Wood*, 644 F.2d at 801 (acknowledging appropriateness of discovery stay where dispositive motions raise issues of jurisdiction, venue, or immunity).

Conversely, the court should deny a motion to stay when discovery is needed to litigate the dispositive motion. *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 383 (9th Cir. 1993); *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975) (same).

With that framework in mind, district courts in this circuit have furnished at least four tests for evaluating whether discovery should be stayed until the potentially dispositive motion is

Page 9 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

resolved. *See*, *e.g.*, *Tradebay, LLC*, 278 F.R.D. at 602-03 (identifying three methods historically employed by Ninth Circuit district courts); *Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, 2:24-CV-00382-GMN-MDC, 2024 WL 2302151, at *2 (D. Nev. May 21, 2024) (identifying a split in the district between two standards for staying discovery). One of those tests, adopted by the court in *Skellerup*, calls for a "case-by-case analysis." 163 F.R.D. at 601. *Skellerup* sets out relevant factors for the court to weigh when considering a motion to stay discovery:

> (1) the type of motion and whether it is a challenge as a "matter of law" or the "sufficiency" of the allegations;
>
> (2) the nature and complexity of the action;
>
> (3) whether counterclaims and/or cross-claims have been interposed;
>
> (4) whether some or all of the defendants join in the request for a stay;
>
> (5) the posture or stage of the litigation;
>
> (6) the expected extent of discovery in light of the number of parties and complexity of the issues in the case;
>
> (7) and any other relevant circumstances.

*Id.*

Both parties rely on the *Skellerup* factors in their briefing. The court finds the *Skellerup* approach reasonable and adopts that method for the purposes of this opinion. As always, the party seeking to withhold discovery has the burden of showing why discovery should be denied. *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (describing that party's burden as a "heavy" one).

**DISCUSSION**

A.    *The Skellerup Factors*

    **1.  Type of Motion**

The first *Skellerup* factor turns on the type of motion pending before the court and whether that motion presents questions of law or fact. Mammoth contends that it raises both legal and factual challenges to Precision's complaint, and further discovery is not required to resolve the motion on either basis. In response, Precision points out that the majority of Mammoth's motion to dismiss is premised on Precision's alleged failure to plead enough facts to state a viable claim for relief. Indeed, just three pages of Mammoth's 33-page motion covers legal preemption issues; the remainder of the arguments goes to the Precision's purported failure to sufficiently allege protectable trade secrets or the misappropriation of those trade secrets.[4] *See Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1085 (9th Cir. 2025) ("Whether a trade secret is identified with 'sufficient particularity' is a question of fact."). The minimal guidance provided by the Ninth Circuit illustrates that, absent any procedural challenges, the court must be *convinced* that Precision will be unable to state a claim for relief in order to grant a discovery stay. *Wood*, 644 F.2d at 801.

---

[4]    In their Reply, the Wagner defendants assert that the litigation between them and Precision "boils down to a pure contract dispute." (Wagner Reply at 2, ECF 57.) They explain that, in their forthcoming motion to dismiss, "the court will be asked to rule as a matter of law on what the terms of the Development Agreement require[.]" (*Id.*) But that motion is not yet before the court, and the court declines to factor mere potential arguments into its analysis or speculate on the merits of the Wagner defendants' motion. *See Litton v. Roblox Corp.*, 25-CV-03088-AMO, 2025 WL 2373343, at *1 (N.D. Cal. Aug. 14, 2025) (applying the "preliminary peek" test and declining a motion to stay discovery premised on forthcoming motions to dismiss).

Page 11 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

The court sees no reason to make that finding here, although it declines to follow the "preliminary peek" approach taken by some courts to put a number on a dispositive motion's likelihood of success. *See Ciuffitelli*, 2016 WL 6963039, at *6 (describing the "preliminary peek" as, at best, "an imperfect procedural mechanism"); *Schrader v. Wynn Las Vegas, LLC*, 219CV02159JCMBNW, 2021 WL 4810324, at *2-4 (D. Nev. Oct. 14, 2021) (declining to take a "preliminary peek" and adopting a more "pragmatic" approach); *Contractor Mgmt. Servs. LLC v. Para, Inc.*, CV-25-01645-PHX-DWL, 2025 WL 2531538, at *2 (D. Ariz. Sept. 2, 2025) (in a trade secret dispute, noting that "the devil is usually in the details, and a preliminary peek is not an effective mechanism for mastering the details"). On their face, neither Precision's complaint nor Mammoth's motion appear frivolous or without merit. The allegations brought by Precision are as serious as they are complex, and Mammoth's grounds for dismissal appear well-reasoned and well-supported. At this time, the court can only comfortably conclude that there is a "reasonable possibility" that Mammoth's motion will have some effect on Precision's claims and the scope of discovery. *Ciuffitelli*, 2016 WL 6963039, at *7. Mammoth's success, however, is not a "foregone conclusion." *Contractor Mgmt. Serv.*, 2025 WL 2531538, at *2.

Mammoth also argues that, if granted, its motion would dispose of every claim brought against it by Precision. Precision counters that, even if the motion to dismiss is resolved in Mammoth's favor, the breach of contract claim brought against Wagner and Wagner Aeronautical would remain. In other words, Precision argues, granting the motion to dismiss would not "dispose of the entire case." (Resp. at 7 (citing *Clark v. Whitepages, Inc.*, 2:25-CV-00810-TL, 2026 WL 100727, at *4 (W.D. Wash. Jan. 14, 2026)).)

The court agrees. Even if Mammoth prevails, Wagner and Wagner Aeronautical will still need to mount their own defenses.[5] That is true regardless of the interrelatedness of the misappropriation claim and breach of contract claim. The factual allegations underlying Precision's claims against Mammoth and Wagner are not so consonant as to render the court's ruling on Mammoth's motion preclusive or binding against the Wagner defendants. For instance, discovery could reveal that Wagner breached the Development Agreement by disclosing propriety information that was confidential, but not necessarily a trade secret. Not only that, but should Mammoth (and the Wagner defendants) prevail, the court is likely to grant Precision leave to amend its complaint. *See* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

How to weigh this factor presents a close call. On the one hand, Mammoth brings largely factual challenges to Precision's complaint, and the complaint is anything but frivolous, meaning Mammoth's success is not assured. And, even if Mammoth does prevail, that resolution will not completely dispose of the case. On the other hand, Mammoth's motion to dismiss appears meritorious, will not require discovery to resolve, and will likely narrow the scope of discovery in some way. As Mammoth points out, that narrowing would create some useful parameters for future discovery disputes—disputes which are all but guaranteed in a case between sophisticated, competitor parties like this one. (Reply at 1, ECF 58.)

---

[5]     The Wagner defendants argue in their Reply that their anticipated motion to dismiss will resolve all of Precision's claims raised against them. (Wagner Reply at 2-3.) Again, the court declines to consider their prospective arguments without the benefit of reviewing their motion. *See supra* note 4.

Page 13 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

Taking Rule 26's proportionality requirement into consideration, the court finds that, on balance, the first factor slightly weighs in favor of granting the stay. *See* FED. R. CIV. P. 26(b)(1) (limiting the scope of discovery to "any unprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case"); *Ciuffitelli,* 2016 WL 6963039, at *8 ("In a complex case where pending motions to dismiss raise credible legal and factual issues, 'the needs of the case' have not yet been finally established. Delaying discovery or limiting its scope until those issues are decided is appropriate and implements [Rule 26's] mandate for a renewed consideration of the time and money litigants must expend on discovery.").

### 2. Nature and Complexity of the Action

The nature and complexity of this case also favor granting the stay. The level of complexity is obvious: Precision alleges that defendants misappropriated "tens of thousands of pages of documents" and extensive, proprietary data related to thousands of aircraft parts. (FAC ¶¶ 35-36.) Those alleged trade secrets were developed by Precision over a number of years. Precision asserts that the "massive scale of the theft" does not justify a stay, citing its "urgent need to . . . investigate and address the harm." (Resp. at 9.) But, as elaborated on below, the court is not persuaded by Precision's urgency argument. There is no denying that the volume of technical documents and data allegedly misappropriated by Mammoth and the Wagner defendants will pose complicated issues of both law and fact.

Further, discovery in trade secret disputes presents a "delicate problem," especially where, as here, the parties are competitors. *Quintara Biosciences, Inc.*, 149 F.4th at 1085. "Requiring too much disclosure too early could encourage fishing expeditions. Requiring too little disclosure too late could prevent the parties from proving or defending their claims." *Id.*

Page 14 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

Each party has much at stake. Without wading into the sufficiency of Precision's complaint and thus the merits of Mammoth's motion to dismiss, the court recognizes that the scope of discovery is quite broad. In Mammoth's view, it is overly broad. Mammoth has made clear that, in the absence of a stay, it will challenge discovery requests that it believes do not fall within the permissible scope of Rule 26 in a reasonable effort to protect its own trade secrets. (MTS at 6.) It is likely that those challenges will raise issues as complex as the issues raised in the complaint and pending dispositive motion. It is therefore in the interest of judicial economy to enter at least a limited stay of discovery until the motions to dismiss are resolved.

### 3. Counterclaims and Cross-claims

Mammoth and the Wagner defendants have yet to file an answer, meaning no defenses, counterclaims, or cross-claims have been asserted. That said, Mammoth anticipates raising, among others, statute-of-limitations and unclean-hands affirmative defenses. Mammoth also hints at a potential counterclaim against Precision. (MTS at 8.) But those affirmative defenses or counterclaims will only be asserted if Precision survives Mammoth's motion to dismiss and Wagner's forthcoming motion to dismiss. As it stands, the current lack of counterclaims or cross-claims favors a stay of discovery as well.

### 4. Defendants Joined in the Request for a Stay

All three defendants agree that a stay should enter. Despite a delayed appearance in this matter, the Wagner defendants joined in Mammoth's motion to stay and intend to file their own dispositive motion. (ECF 46.) This factor, too, favors a discovery stay.

### 5. Posture or Stage of Litigation

This case is not yet six months old. Precision filed this lawsuit on October 20, 2025. Mammoth filed its current motion to dismiss on February 2, 2026; the Wagner defendants intend to move to dismiss by March 20, 2026. Oral argument on those motions is already set for June 3, 2026. (ECF 61.)

In a dispute such as this one, "final resolution is best measured not in months but in yearly increments." *Ciuffitelli*, 2016 WL 6963039, at *7. Assuming any of its claims survive dismissal, Precision will likely need to amend its complaint. Then, motion practice regarding discovery will ensue. Because it is likely that the life span of this case will be considerably long, a discovery stay at this early stage will not amount to a significant delay.

### 6. Expected Extent of Discovery

Neither party disputes that discovery in this case will be extensive. As Mammoth points out, Precision has already served hundreds of discovery requests on it and third parties related to the tens of thousands of allegedly misappropriated documents. And that does not account for the discovery Mammoth will seek from Precision—some of which may span over 25 years. (MTS at 8.) In response, Precision maintains that "the fact that discovery will have scope commensurate to Wagner's massive theft is not a basis to stay it." (Resp. at 10.) But, under these factors, the scope and extent of discovery is just that—a basis to stay. Discovery in this case involves thousands of potentially stolen trade secrets, dozens of potential witnesses, and spans two decades. That no doubt weighs in favor of a stay.

**B.**     *Other Relevant Considerations*

Although it has been touched on, another relevant consideration is that this is a dispute between competitors, and "courts should be particularly wary of allowing discovery to proceed during the pendency of a non-frivolous and potentially case-dispositive motion to dismiss where . . . commercially sensitive documents will be exchanged." *Contractor Mgmt. Servs.*, 2025 WL 2531538, at *3; *see also Aristocrat Techs., Inc.*, 2024 WL 2302151, at *3 ("Furthermore, the discovery sought includes defendants' highly confidential and proprietary source code, as well as defendants' marketing plans and strategies. Defendants are competitors of plaintiffs. The Court finds that disclosure of such information while (1) a Motion to Dismiss is pending and (2) no determination has been made about whether plaintiffs have stated a claim, is unduly burdensome.").

Precision argues that the two-tier protective order that the parties have asked the court to enter is sufficient to protect Mammoth's interests. (Resp. at 10.) But the parties have yet to agree on the terms of that protective order and it is speculative whether they will do so. (*See* ECF 42 (noting that the court deferred ruling on the parties' protective order dispute).) Further, protective orders "do[] not always fully eliminate the sort of concerns that [d]efendants have raised here, particularly in litigation between direct competitors." *Contractor Mgmt. Servs.*, 2025 WL 2531538, at *3 (quotation marks omitted).

Precision is correct that "the relatively remote potential for inadvertent disclosure of confidential documents does not justify the withholding of discovery altogether." (Resp. at 10 (quoting *AFMS LLC v. United Parcel Service Co.*, 12cv1503 JLS (NLS), 2012 WL 3112000, at *7 (S.D. Cal. July 30, 2012))). But here, that potential is not so remote. In fact, it is almost

Page 17 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR

guaranteed that highly sensitive, proprietary information will need to be disclosed between the parties. The court is not persuaded by Precision's attempt to downplay that risk.

Precision also urges the court to consider the prejudicial effect of a discovery stay, citing its "urgent need . . . to investigate and address the harm." (Resp. at 9.) At the status conference with the court, Precision indicated that it needed discovery to support a potentially forthcoming motion for a preliminary injunction, but it did not reiterate that argument in its briefing. Mammoth believes that Precision has "slept on its claims for year," undermining any claimed need for urgency. (Mammoth Reply at 5, ECF 58.)

Without taking a position on whether Precision acted quickly enough on its claims, the court finds that Precision has not adequately articulated why a stay will be prejudicial. As Precision makes clear in its complaint, it takes many years to acquire an STC. And even if Mammoth is successful during the pendency of this case, that will not foreclose Precision's ability to pursue its claims or prove its damages.

In sum, the court finds that all the relevant factors support a discovery stay.

### CONCLUSION

For the above reasons, defendants' Motion to Stay Discovery (ECF 43) is GRANTED. In the event the court denies the motions to dismiss, the parties shall confer and submit a joint Rule 26(f) report and discovery plan within 14 days of the order resolving the motions to dismiss.

DATED: March 12, 2026

_____
JEFF ARMISTEAD
United States Magistrate Judge

Page 18 – OPINION AND ORDER
*Precision Conversions, LLC v. Mammoth Freighters, LLC, et al.*, 3:25-cv-01927-AR