UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PRECISION CONVERSIONS, LLC, *an Oregon company*, and 321 PRECISION CONVERSIONS, LLC, *an Oregon company*,

Plaintiffs,

v.

MAMMOTH FREIGHTERS, LLC, *a Delaware company*, WILLIAM J. WAGNER, *an individual*, and WAGNER AERONAUTICAL, INC., *a California corporation*,

Defendants.

Case No. 3:25-cv-01927-AR

**FINDINGS AND RECOMMENDATION**

---

**ARMISTEAD, United States Magistrate Judge**

Plaintiff Precision Conversions, LLC, and 321 Precision Conversions, LLC (together, Precision) bring this trade secret misappropriation action against defendants Mammoth Freighters, LLC, William J. Wagner, and Wagner Aeronautical (together, Wagner). All parties operate in a specialized sector of the aviation industry, focusing exclusively on converting passenger planes to cargo planes. Twenty years ago, Precision Conversions contracted with

Wagner on Precision's first conversion project, the Boeing 757. To obtain regulatory approval to convert the 757, Precision generated thousands of documents, valuable tools, and other work product for submission to the Federal Aviation Administration (FAA). That data, Precision alleges, is a trade secret and belongs solely to Precision. Wagner left Precision in 2006 and, in 2020, cofounded a new conversion company, Mammoth. Mammoth's first conversion project is the Boeing 777. Precision alleges that, through Wagner's unlawful disclosure, Mammoth has acquired and is using Precision's 757 data to develop its 777 conversion.

Against all defendants, Precision alleges federal and state trade secret misappropriation claims and common law conversion. Against Mammoth, Precision brings a claim of tortious interference. Against Wagner, Precision brings a breach of contract claim. Precision seeks actual, compensatory, and punitive damages, injunctive relief, and for defendants to be held jointly and severally liable. Mammoth and Wagner move separately to dismiss all claims against them. For the reasons stated below, both motions should be GRANTED in part and DENIED in part.

**BACKGROUND**

The court provided the following facts in its previous order granting Mammoth's motion to stay discovery. (ECF 62.) Those facts are repeated here for convenience.

In the early 2000s, Precision Conversions began working toward applying for its first Supplemental Type Certificate (STC) from the FAA. STCs permit the certificate holder to convert decommissioned passenger planes into cargo planes, which extends the service life of the plane. Along with the STC, Precision also had to obtain approval to manufacture FAA-compliant parts for its converted planes, referred to as Parts Manufacturing Approval (PMA). Conversions

can call for thousands of parts, all of which must be designed, tested, and manufactured by the STC holder. (First Am. Compl. (FAC) ¶¶ 14-20, ECF 32.)

Unsurprisingly, the STC application process is technical, expensive, and takes many years to complete. For instance, only a handful of companies hold STCs to convert the Boeing 757 and Airbus A321—Precision is one of them. Precision alleges that it took five years, tens of millions of dollars, and over 80 engineers to obtain the Boeing 757 STC. The Airbus A321 STC took another five years and cost nearly twice as much. (FAC ¶¶ 19, 22.)

In 2001, when Precision set out to apply for the Boeing 757 STC, it had two members: Erickson Ventures LTD, which owned 99.935 percent of the company, and William Wagner, who owned 0.065 percent. Wagner operated in a Vice President role, and Precision contracted with Wagner's company, Wagner Aeronautical, to develop Precision's 757 conversion program, for which Precision alleges Wagner was the "lead engineer." (*Id.* ¶ 24.) Early on, Precision, Wagner, and Wagner Aeronautical entered into a Development Agreement in which Precision asserts that Wagner and Wagner Aeronautical released their "entire right, title, and interest in and to the STC, the Conversion, and all proprietary rights therein, including, without limitation, all 'Data' and 'Precision Know-How'." (*Id.* ¶¶ 25-26.) Under the Development Agreement, all related intellectual property rights belonged to Precision, and Wagner was prohibited from disclosing any proprietary information without Precision's written approval. The Agreement granted Wagner a license to use certain "Precision Know How," as long as the "Know How" was maintained a trade secret. (*Id.* ¶¶ 26-31.)

But that license excluded the use of any "Data," as defined under the Agreement, that belonged to Precision. (*Id.* ¶ 30.) That "Data," Precision alleges, encompasses all of the

information generated over the many years it took to develop the 757 conversion program and obtain the STC—"tens of thousands of pages of documents [and] testing data generated in qualifying thousands of specific airline parts for FAA approval." (*Id.* ¶ 35.) As alleged by Precision, that "compilation of information," as well as containing individual trade secrets, constitutes a trade secret in and of itself because it is both maintained as confidential and has substantial value. (*Id.*) Few companies hold STCs for passenger-to-cargo conversions, meaning those that do stand to earn large profits by either charging customers to convert an aircraft, or converting and selling the converted aircraft themselves. (*Id.* ¶ 37.)

Precision asserts that Wagner and Wagner Aeronautical signed a comprehensive confidentiality agreement in 2001 that covered Precision's "business affairs and all matters in which Precision has an interest." (*Id.* ¶ 43.) Employees and suppliers of Precision sign similar non-disclosure agreements, and any STC-related document is "routinely" marked as proprietary. (*Id.* ¶¶ 44-46.)

In 2013, 321 Precision was formed as an affiliate of Precision Conversions and began the process of applying for the Airbus A321 STC. For the same reasons articulated above, Precision asserts that all of the data developed during the Airbus A321 STC process are valuable trade secrets as well. (*Id.* ¶¶ 49-58.)

Wagner left Precision in 2006. (*Id.* ¶ 75.) In 2020, he cofounded defendant Mammoth Freighters. Mammoth is funded by a private equity group with no previous experience in passenger-to-freighter plane conversions. Despite that, Mammoth intends to acquire an STC to convert Boeing 777s, one of the most expensive and labor-intensive STCs to secure—if it is successful, it will be just the second company in the world to do so. (*Id.* ¶¶ 59-65.)

According to Precision, Mammoth and Wagner Aeronautical entered into a Conversion Program Development Agreement in 2021, under which Wagner agreed to develop, maintain, and implement a Boeing 777 STC and provide related "engineering and technical support." (*Id.* ¶ 61.) Although not identical, Precision alleges that many of the processes, procedures, and technical elements of a 757 or Airbus conversion carry over to a 777 conversion. (*Id.* ¶ 63.) Since forming in 2020, Mammoth has recruited at least 20 former Precision employees. (*Id.* ¶¶ 66-67.)

In 2023, Precision learned for the first time that Mammoth was allegedly in possession of a Precision trade secret—a Finite Element Model, or FEM, developed for its 757 conversion program.[1] (*Id.* ¶ 69.) Precision asserts that its 757 FEM took years to develop and entailed acquiring, measuring, and testing an actual 757 aircraft. (*Id.* ¶ 39.) In the Development Agreement signed by Precision, Wagner, and Wagner Aeronautical, the 757 FEM is expressly identified as part of the "Data" that Wagner had no license to retain or use. Precision alleges that, not only did Wagner improperly disclose the FEM to Mammoth, Mammoth misused the FEM to "approximate" a 777 aircraft. (*Id.* ¶¶ 70-72.)

Then, in 2025, a Precision employee "performing consulting services for Mammoth" found documents belonging to Precision on Mammoth's internal database. (*Id.* ¶ 73.) All three of the reports predate Wagner's separation from Precision and were marked as proprietary. Precision alleges that those reports would be useful in the development of a 777 conversion. (*Id.* ¶¶ 74-78.) Precision also discovered a 2024 email thread between two Mammoth employees in

[1] In the aircraft conversion context, a FEM "is a computer model of an aircraft that, among other things, provides a virtual testing environment for contemplated changes." (FAC ¶ 39.)

which one of Mammoth's engineers (incorrectly) explained that Mammoth could use all of the 757 data because "Precision and Wagner Aeronautics had a partnership of some kind." (*Id.* ¶ 79.)

Sometime before then, in 2023, Wagner Aeronautical moved out of its offices in California. A former Precision employee, now working for Mammoth, contacted Precision and asked what should be done with "a room full" of Precision 757 data. (*Id.* ¶ 81.) Erickson, Precision's founder, asked Wagner to return the documents, but he never did so. (*Id.*)

In addition to alleging that Wagner unlawfully disclosed the Precision "Data" to Mammoth, who, in turn, unlawfully used that "Data" to develop its own 777 conversion program, Precision also alleges that Mammoth misappropriated trade secrets related to Precision's Airbus A321 STC through former Precision employees. To support that allegation, Precision asserts that one of Mammoth's solenoid blocks developed as part of its 777 conversion program bears a "striking resemblance" to a solenoid block with a novel sequencing structure designed by a former Precision employee. That employee now works at Mammoth. (*Id.* ¶¶ 82-84.) Not only that, but Precision alleges that at least one document related to its A321 conversion program has been found on Mammoth's servers. (*Id.* ¶ 84.)

Precision Aircraft Solutions, LLC, the holding company for subsidiaries Precision Conversions and 321 Precision, sued Mammoth in October 2025. (ECF 1.) After Mammoth asserted in its first motion to dismiss that Precision Aircraft Solutions lacked standing to sue on behalf of its subsidiaries (ECF 22), Precision amended its complaint and added Precision Conversions and 321 Precision as plaintiffs and Wagner and Wagner Aeronautical, Inc. as defendants. (ECF 32.)

Soon after Precision amended its complaint, the court granted its *ex parte* request for alternative service on Wagner and Wagner Aeronautical (ECF 40), as Wagner's only available address was at his alleged vacation home in Washington and the address of Wagner Aeronautical's registered agent in California was, according to the process server, closed and fenced up. (*See* Burnside Decl., Exs. 2, 4, ECF 37.) Wagner and Wagner Aeronautical's counsel filed an appearance in this case on February 12, 2026. (ECF 45.)

Mammoth moved again to dismiss on February 2, 2026 (ECF 39), on two bases: (1) Precision failed to sufficiently plead its claims, and (2) the tort claims are preempted by the Oregon Uniform Trade Secrets Act (OUTSA). Shortly after, Mammoth moved to stay discovery pending resolution of the motion to dismiss (ECF 43); Wagner joined that motion (ECF 46). The court stayed discovery on March 12, 2026. (ECF 62.) Wagner moved to dismiss on March 20, 2026 (ECF 64) on similar grounds as Mammoth. Oral argument was held on June 3, 2026.

## LEGAL STANDARD

Rule 12(b)(6) allows for motions to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A court will grant a Rule 12(b)(6) motion to dismiss for failure to state a claim when a claim is unsupported by a cognizable legal theory or when the complaint is without sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but

it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

The complaint "may not simply recite the elements of a cause of action"; instead, it must contain "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis added); *Iqbal*, 556 U.S. at 678 (Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). In evaluating the sufficiency of a complaint, the court accepts as true all well-pleaded factual allegations and construes them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Iqbal*, 556 U.S. at 678-79. Generally, material beyond the pleadings is not considered on a Rule 12(b)(6) motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

## DISCUSSION—PRELIMINARY MATTERS

### A. *2001 Development Agreement*

Mammoth and Wagner argue that the 2001 Development Agreement[2] between Precision and Wagner forecloses any trade secret misappropriation claims asserted by Precision. (*See* Mammoth Reply, ECF 63 at 11; Wagner MTD, ECF 64 at 18; Dev. Agreement, ECF 32-1.) The

---

[2] Precision attached the Development Agreement to its FAC. (*See* ECF 32-1.) The court incorporates the Agreement by reference. FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Agreement allocated rights and interests related to the 757 STC conversion project. At the heart of the interpretational disagreement is Subsection 1(a):

- Wagner granted Precision "its entire right, title and interest in and to the STC, the Conversion, and all proprietary rights therein, including, without limitation, all 'Data' and 'Precision Know-How.'"

- "Data" is defined as "all tools, documentation, and other work product developed in the course of, necessary for the obtainment of, or necessary in the operation under, the 757 STC or the Conversion," including but not limited to the FEM "and all supporting data, all loads analyses for whatever source derived, and all information submitted to the FAA in, with or in support of the application for the 757 STC."

- "Precision Know-How" is defined as "all *intangible* methods, processes, improvements, concepts, ideas, and information developed by or for Wagner in the course of, necessary for the obtainment of, or necessary in the operation under the 757 or the Conversion unique to the 757 STC or the Conversion."

- "Wagner Know-How" is defined as "all *intangible* methods, processes, improvements, concepts, ideas, and information necessary for the obtainment of, or necessary in the operation under, the 757 STC or the Conversion that are not unique to the 757 STC or the Conversion."

- Finally, "'Know-How' includes all patents, patent applications, copyrights, *trade secrets* or other proprietary rights. 'Know-How' does not include data."

(Dev. Agreement, ECF 32-1 § 1(a) (emphasis added).)

Subsection 1(e) governs Precision's license of Wagner Know-How, in which Wagner was granted a "perpetual, non-exclusive, royalty-free license to use any Precision Know-How" as long as Wagner did not use "such intangible property" in violation of the five-year noncompete provision and maintained "such intangible property as a trade secret of Precision." (*Id.* § 1(e).) Subsection 1(e) also permits Wagner to sublicense Precision Know-How. But if Wagner violates the noncompete or fails to maintain Precision Know-How as a trade secret, Wagner's license

would "automatically and irrevocably terminate." (*Id*.) Wagner granted Precision the same license to use and sublicense "Wagner Know-How." (*Id.* § 1(e).)

Defendants' interpretation of the Development Agreement hinges on the penultimate sentence of Subsection 1(a). Defendants argue that, because Wagner either owns or has a license to use or sublicense all Know-How, whether it belongs to Precision or Wagner, and because Know-How includes "all" trade secrets, Precision cannot state a claim for trade secret misappropriation or, as relates to Wagner, for breach. Put simply, it is defendants' position that under the plain language of the Development Agreement, Data "cannot constitute trade secrets" and "is not proprietary" because "all" trade secrets fall into the Know-How category. (Wagner MTD, ECF 64 at 18; Mammoth Reply, ECF 63 at 18.)

Precision responds that Wagner's interpretation of the Development Agreement is "nonsensical." (Resp., ECF 67 at 4.) Precision points to the starting sentence in Subsection 1(a), which states that Wagner grants Precision "all proprietary rights" in the 757 STC and the Conversion, including all Precision Know-How and Data. It follows then, in Precision's view, that there are proprietary rights in Precision Know-How *and* the Data, despite defendants' contention otherwise. (*Id.* at 5-6.)

Precision also argues that defendants' interpretation is irreconcilable with the contract's other provisions and within the overall context of the Agreement. (*Id.* at 6-8.) For instance, the Agreement states several times over that Precision retains exclusive proprietary rights in the Data. It would make little sense for Precision, as the majority (99.935 percent) owner of the 757 STC, to "convert the wealth of trade secrets in the 'Data' to 'Know-How'—to which the Wagner would then have a license." (*Id.* at 7.) Precision also asserts that Subsection 1(a)'s structure

supports its interpretation of the Agreement. As the disputed provision, the penultimate sentence follows directly after, and thus modifies, the definitions of Precision Know-How and Wagner Know-How; it does not, however, "strip" Precision of any proprietary rights it may have in the Data. (*Id.* at 8.)

The task for the court, then, is to interpret the Agreement and the disputed provision, Subsection 1(a). To do so, the court follows Oregon appellate courts' three-step inquiry for interpreting a contract. *Yogman v. Parrott*, 325 Or. 358, 361 (1997); *Batzer Construction, Inc. v. Boyer*, 204 Or. App. 309, 317 (2006) ("In addition to the contract interpretation methodology expressed in *Yogman*, "to determine whether a contractual provision is ambiguous, the trial court can properly consider the text of the provision in the context of the agreement as a whole and in light of the *circumstances underlying the formation* of the contract.") (emphasis added).

First, the court must determine, as a matter of law, whether the disputed provision is ambiguous, meaning subject to more than one plausible interpretation. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 210 F. Supp. 3d 1259, 1263 (D. Or. 2016) (citing *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011)); *Batzer*, 204 Or. App. at 317 (looking to agreement's context and circumstances leading to formation of the agreement). And the court construes the contract in a way that gives effect to all its provisions and must not "insert what has been omitted, or to omit what has been inserted." *Id.* (quoting ORS § 42.230; *Yogman*, 325 Or. at 361). If the provision is unambiguous, the court applies the contract term to the facts. If the term is ambiguous, however, the trier of fact must examine the extrinsic evidence of the parties to determine the parties' intent and interpret the disputed term consistent with that intent. *Id.* That means that, on a motion to dismiss, the analysis must end if the provision is ambiguous, and the

motion to dismiss must be denied. *Ness & Campbell Crane, Inc. v. Kleppe*, 3:17-CV-01865-HZ, 2018 WL 1702049, at *4 (D. Or. Apr. 5, 2018) (citing *Arnett v. Bank of Am.*, 874 F. Supp. 2d 1021, 1031 (D. Or. 2012)).

Both parties assert that their interpretation is the only plausible one. The court disagrees. On the one hand, defendants' interpretation is reasonable, as the language of the disputed provision is broad, defining Know-How to include "all" trade secrets. (Dev. Agreement, ECF 32-1 § 1(a) (emphasis added).) At the same time, Precision's interpretation confining application of that provision to the definitions of Precision and Wagner Know-How is also reasonable in light of Subsection 1(a)'s overall structure. Precision also rightly calls into question Wagner's theory that Precision intended to include all its valuable intellectual property and trade secrets developed for the 757 STC in Know-How and, as a result, grant Wagner a perpetual license to use and sublicense out that Know-How.

Further, Subsection 1(a) limits Know-How to *intangible* "methods, processes, improvements, concepts, ideas, and information," including, seemingly, *intangible* trade secrets. (Dev. Agreement § 1(a).) The trade secrets alleged by Precision are *tangible* "Data"—"tools, documentation, and other work product" produced as part of Precision's 757 conversion project and submitted to the FAA. (*Id.*) For example, Precision alleges that several internal reports, as well as the FEM, have been misappropriated. (FAC ¶¶ 72-76.) Under the Agreement, "Data" expressly includes the FEM. (Dev. Agreement, ECF 32-1 § 1(a).) And, according to Precision, "Data" also includes the internal reports. (FAC ¶ 75.) The court cannot find any reason to doubt that allegation as currently pleaded.

The Agreement does not define trade secrets one way or another, nor does it speak how the parties intended to treat to *tangible* trade secrets. Generally, the fact that a contract is silent on a particular issue does not alone make it ambiguous. *Morton & Assocs., LLC v. McCain Foods USA, Inc.*, 226 Or. App. 532, 538 (2009). But for the purposes of these motions to dismiss, the Agreement is ambiguous. It is unclear whether the parties intended for Precision and Wagner Know-How to include only intangible trade secrets or tangible *and* intangible trade secrets, and both interpretations are plausible. *See Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985) ("A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation; it is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person."); *McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc.*, 3:18-CV-01921-SI, 2019 WL 3412903 (D. Or. July 29, 2019) (on summary judgment, holding that contract was ambiguous where terms were undefined and parties offered multiple plausible interpretations). Dismissal of Precision's trade secret claims on this ground is thus inappropriate at this stage. *See Arnett*, 874 F. Supp. 2d 1021, 1031 (D. Or. 2012).

**B. *Trade Secret Misappropriation Pleading Standard***

To state a claim for trade secret misappropriation under the federal Defend Trade Secrets Act (DTSA) and OUTSA, Precision must allege that (1) it possessed a trade secret; (2) defendants misappropriated the trade secret; and (2) that the misappropriation caused or threatened damage to Precision. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020); *see also Columbia Sportswear Co. v. Ferreira*, 809 F. Supp. 3d 1163, 1176 (D. Or. 2025) ("Because the DTSA and OUTSA are similar, many courts . . . evaluate them together.").

Mammoth and Wagner move to dismiss Precision's DTSA and OUTSA claims for failure to state a claim under Rule 12(b)(6) because, in their view, Precision fails to allege any protectable trade secrets or misappropriation. Although defendants advance separate arguments in their motions, they both attack Precision's FAC for failing to identify the alleged trade secrets with the requisite level of specificity. (*See* Mammoth MTD, ECF 39 at 10-14; Wagner MTD, ECF 64 at 18-22.)

"Trade secret cases 'start from the important premise that the definition of what may be considered a trade secret is broad.'" *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1087 (2025) (quoting *InteliClear*, 978 F.3d at 657). Under federal and Oregon law, a trade secret consists of three elements: (1) information, (2) that derives independent economic value from not being generally known to the public or readily ascertainable through proper means, and (3) is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); ORS § 646.461(4).

The parties dispute whether Precision must identify its trade secrets with "sufficient particularity." Mammoth contends that, in addition to pleading facts sufficient to satisfy the statutory elements of a trade secret, Precision must also "'identify the alleged secrets with sufficient particularity' . . . 'to permit the defendant to ascertain at least the boundaries within which the secret lies.'" (Mammoth MTD, ECF 39 at 9 (quoting *Com. Fire Prot., LLC v. Pigg*, 3:24-cv-922-AN, 2025 WL 593574, at *3 (D. Or. Feb. 21, 2025).) Wagner also asserts that Precision must identify the alleged trade secrets with sufficient particularity "to show that something beyond general knowledge is being claimed and [] to put the defendant on notice regarding the nature of the trade secret." (Wagner MTD, ECF 64 at 19 (citing *Shita v. Taylor*,

3:25-cv-00051-AN, 2025 WL 507306, at *3 (D. Or. Feb. 14, 2025).) In defendants' view, Precision's factual allegations fall short. Precision responds that Mammoth and Wagner seek to impose a heightened, and improper, pleading standard. The court agrees with Precision.

"[W]hether a . . . plaintiff has identified information that is sufficiently particular to constitute a trade secret . . . is a question of fact [and] usually a matter for summary judgment or trial." *Quintara Biosciences*, 149 F.4th at 1085. In *Quintara*, after the parties' Rule 26 conference but before discovery, defendant Ruifeng moved for a protective order to stay discovery until Quintara specified its trade secrets "with sufficient particularity." *Id.* at 1086. Quintara only brought DTSA claims and did not bring any claims under California's Uniform Trade Secret Act (CUTSA). Yet, in its motion, Ruifeng relied on CUTSA section 2019.210, which, unlike DTSA, requires plaintiffs to identify trade secrets with "reasonable particularity" before discovery begins. *Id.* The lower court granted Ruifeng's motion, also relying in part on section 2019.210, and ordered Quintara to disclose more details about its allegedly misappropriated secrets.

When Ruifeng remained unsatisfied with the specificity of Quintara's disclosures and amended disclosures, it moved to strike Quintara's alleged trade secrets. The lower court granted that motion, acknowledging that although CUTSA did not govern Quintara's DTSA claims, borrowing California's "reasonable particularity" rule permitted the court to "nail down" Quintara's alleged trade secrets and "discern the reasonable bounds of discovery." *Id.* Employing that standard, the court found that Quintara failed to adequately identify nine of its eleven trade secrets. Quintara proceeded to trial on one of the two surviving trade secrets and lost. *Id.* at 1086-87.

On appeal, the Ninth Circuit held that the lower court erred in applying the California rule to a federal trade secret claim at this stage of the litigation. *Quintara* observed that, unlike CUTSA's "reasonable particularity" rule, DTSA requires a plaintiff "to identify a trade secret with 'sufficient particularity' as a matter of fact[.]" *Id.* at 1088-89 (citing *InteliClear*, 978 F.3d at 659). DTSA does not "set out requirements for the specific timing or scope for identifying trade secrets." *Id.* at 1089. Instead, "the conventional procedures under the Federal Rules of Civil Procedure apply." *Id.* By striking Quintara's trade secrets and effectively dismissing most of Quintara's claims before any discovery had changed hands, the district court had abused its discretion.

The OUTSA does not have a rule comparable to the California rule. Precision argues, and the court agrees, that to survive a motion to dismiss, Precision is under no obligation to identify its trade secrets with "reasonable" or "sufficient" particularity beyond what is required by Rule 8's plausibility standard.[3] It is defendants' view, however, that *Quintara* bears little on the court's Rule 12(b)(6) analysis because it was procedurally different—an appeal of a motion to strike, rather than a motion to dismiss. (Mammoth MTD, ECF 39 at 11 n.6.) Wagner asserts that *Quintara* says "nothing about the level of detail needed to state a claim for trade secret misappropriation[.]" (Wagner Reply, ECF 68 at 9.) But *Quintara* held that "the federal DTSA does not require a plaintiff to identify with particularity its alleged trade secrets from the start." 149 F.4th at 1085. If a complaint is anything, it is the "the start" of litigation.

---

[3] Although federal pleading standards apply, it is worth noting here that the Oregon Court of Appeals has reached the same conclusion as the Ninth Circuit in *Quintara* and held that whether information constitutes a trade secret is a question of fact. *Kaib's Roving R.PH. Agency, Inc. v. Smith*, 237 Or. App. 96, 101 (2010) (collecting cases).

Contrary to Mammoth's arguments, *Quintara's* holding is relevant here.[4] That is because the court's decision depended on *when* Quintara was required to sufficiently identify its alleged trade secrets. *See McAdory*, 935 F.3d at 843 ("[W]here a panel confronts an issue germane to the eventual resolution of the case and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." (quoting *Cetacean Community v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004)); *see also Skye Orthobiologics, LLC v. CTM Biomedical, LLC*, 351 F.R.D. 155, 160 (C.D. Cal. 2026) (recognizing that *Quintara* "did make new law in establishing the different particularity standards for DTSA and CUTSA claims").

Wagner asserts that "[t]he Ninth Circuit has repeatedly recognized that a claimed trade secret must be defined with 'sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" (Wagner MTD, ECF 64 at 21 (quoting *Quintara*, 149 F.4th at 1087).) Wagner omits, however, that per *Quintara*, that standard goes to what Precision must *prove*, rather than what it must *plead*. *See* 149 F.4th at 1087 ("[A] plaintiff must *prove* that the claimed trade secret has

---

4 Mammoth goes so far as to describe *Quintara*'s holding as a "casual, unreasoned comment" and "nonprecedential dicta." (Mammoth Reply, ECF 63 at 3-4 (citing *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019)). That argument is undeveloped and unsupported. Striking Quintara's trade secrets was an abuse of discretion *because* whether a DTSA plaintiff identified a trade secret with "sufficient particularity" was a question of fact appropriately answered after at least some discovery had been exchanged. The panel explained how plaintiffs bringing trade secret claims "may have commercially valid reasons to avoid being overly specific at the outset in defining their intellectual property." 149 F.4th at 1088 (quoting *InteliClear*, 978 F.3d at 662). *Quintara* described discovery in trade secret cases as a "delicate problem" and an "iterative process where requests between parties lead to a refined and sufficiently particularized trade secret identification." *Id.*

'sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.' Whether a trade secret is identified with 'sufficient particularity' is a question of fact.") (citations omitted) (emphasis added). The court has not identified a single Ninth Circuit case applying the "sufficient particularity" standard on a motion to dismiss.

By conflating what Precision must prove at summary judgment or trial with what Precision must allege in its complaint, defendants ask the court to resolve the merits of Precision's claims on a Rule 12(b)(6) motion.[5] *See Quintara*, 149 F.4th at 1091 (lower court's reason for striking trade secrets went to their merits—a fact question that should have been reserved for summary judgment or at trial) (citing *InteliClear*, 978 F.3d at 658-659); *Esha Rsch., LLC v. RLH Assets, LLC*, 3:25-cv-00880-AB, 2026 WL 1121951, at *6 (D. Or. Apr. 24, 2026) (on challenge to plaintiff's standing, declining to resolve whether plaintiff identified its trade secrets with sufficient particularity before any discovery had ensued and instead evaluating whether plaintiff had adequately *alleged* its trade secrets under Rule 12(b)(6)). The court declines to do so at this stage, as such a determination would be "premature." *Esha Rsch.*, 2026 WL 1121951, at *6; *see also InteliClear* 978 F.3d at 662 ("Federal cases analyzing whether a

[5] The Ninth Circuit and district courts in this circuit consistently require plaintiffs to identify their allegedly misappropriated trade secrets with "sufficient particularity" on summary judgment. *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-67 (9th Cir. 1998); *InteliClear*, 978 F.3d at 659; *Valeo Schalter und Sensoren GmbH v. NVIDIA Corp.*, 23-CV-05721-NW, 2025 WL 2505112 (N.D. Cal. Aug. 25, 2025) (noting that, on summary judgment, "a plaintiff must identify the trade secrets and carry the burden of showing they exist to demonstrate a disputed issue of fact as to one of the elements of a trade secret misappropriation claim[.]").

plaintiff's trade secrets are described with 'sufficient particularity' typically arise in the battleground of discovery.").

In sum, to survive dismissal under Rule 12(b)(6), Precision must allege enough facts to (1) "plausibly suggest an entitlement to relief," *Iqbal*, 556 U.S. at 681, and (2) "put defendant on notice of the claim, such that [it] may defend [itself] effectively." *Starr*, 652 F.3d at 1212. The first element of a trade secret misappropriation claim is possession of a trade secret. *InteliClear*, 978 F.3d at 657-58. To plausibly allege that the information it possessed is a trade secret, Precision must show that it took reasonable efforts to maintain the information's secrecy and that the information derived some independent economic value from that secrecy. 18 U.S.C. § 1839(3); ORS § 646.461(4). Having resolved the pleading standard issue, the court turns to Mammoth's and Wagner's individual motions.

## DISCUSSION—MOTIONS TO DISMISS

### A. *Mammoth's Motion to Dismiss*

Mammoth's motion should be granted in part and denied in part. Precision states a trade secret misappropriation claim related to the 757 STC Data. Precision fails to sufficiently allege, however, that Mammoth misappropriated any trade secrets related to the Airbus conversion or that Mammoth intentionally interfered with its economic relations.

#### 1. Trade Secret Misappropriation

Mammoth argues that Precision has not plausibly alleged that any of the information identified in the FAC qualifies as a trade secret, nor plausibly alleged that Mammoth misappropriated any of those trade secrets. There are at least four alleged trade secrets at issue, of which the most significant is the entirety of Precision's 757 STC Data. That "compilation"

trade secret includes the "research, design, conformance, and testing data generated in qualifying [] thousands of specific aircraft parts" and the FEM. (FAC ¶ 36.) Precision also alleges that "individual pieces of information within the compilation of Data" are protectable trade secrets, such as the FEM and the individual qualification documents. (*Id.* ¶ 39.) Finally, Precision alleges that its solenoid block design, developed for 321 Precision's Airbus STC, is a trade secret subject to misappropriation by Mammoth. As the court will explain, Precision adequately states a trade secret claim against Mammoth for misappropriation of the 757 STC Data and the individual pieces of data contained within that compilation. Precision does not, however, state a trade secret misappropriation claim for any of its Airbus data.

**a. Precision sufficiently alleges that the 757 STC Data is a compilation trade secret.**

Mammoth primarily targets Precision's compilation trade secret—the 757 STC Data. Mammoth first contends that, to survive dismissal, Precision must "describe how the components of its alleged compilation 'form the unique whole,'" and "identif[y] the 'boundaries' between the public and secret aspects of its compilation." (Mammoth MTD, ECF 39 at 13-14 (citing *Alt. Legal Sols. v. Ferman Mgmt. Servs., Corp.*, CV-07-880-ST, 2009 WL 10733692, at *10 (D. Or. May 5, 2009) (D. Or. May 5, 2009), *findings and recommendation adopted*, 2009 WL 10733694 (D. Or. June 8, 2009) and *ESHA Rsch.*, 2025 WL 2697107, at *6).) Mammoth's first argument is not the law. As for the second argument, Precision sufficiently alleges that the 757 STC Data is maintained as confidential and not generally known in the industry or readily ascertainable. In other words, there are no "public aspects" of the compilation that require defining from other, secret aspects.

Compilations of information can qualify as a trade secret. *See* 18 U.S.C. § 1839(3) (trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes"); ORS § 646.461(4) ("Trade secret" means "information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process.").

Mammoth argues that Precision must "allege 'the way in which [its] various components fit together as building blocks in order to form the unique whole.'" (Mammoth MTD, ECF 39 at 13 (quoting *Alt. Legal Sols.*, 2009 WL 10733692, at *10).) That argument is not well taken, for two reasons. First, the court agrees with Precision that *Alternative Legal Solutions* "says nothing about what a plaintiff must allege because it was a summary judgment disposition." (Resp., ECF 59 at 18.) Second, Precision correctly points out that *Alternative Legal Solutions* quoted the "building blocks" language from a Second Circuit opinion that merely identified one way that a compilation trade secret could be established—*i.e.*, a plaintiff could assert trade secret protection over how otherwise generic or publicly available components "interact" or "fit together." *See Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990). But Precision plausibly alleges that it goes through great lengths to keep its 757 STC Data confidential. The documents and data Precision seeks to protect are not so publicly available that, to qualify as a trade secret, Precision must also allege facts about the unique architecture or integration of those documents and data. In other words, *Alternative Legal Solutions* is not on point.

Mammoth also faults Precision's FAC for failing to plausibly allege that the complication of 757 STC Data meets the statutory definition of a trade secret. To be afforded trade secret protection, information must derive independent economic value from not being generally known to the public or readily ascertainable through proper means and must be the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); ORS § 646.461(4).

Mammoth argues first that Precision does not plead facts separating its alleged trade secrets from "general knowledge in the industry." (Mammoth MTD, ECF 39 at 14.) Mammoth asserts that, because all companies must follow the same regulatory process to obtain an STC, those processes are "widely known" and the documents prepared and submitted to receive that STC are not trade secrets. (*Id.* at 15 (quoting *Julie Rsch. Lab'ys, Inc. v. Select Photographic Eng'g, Inc.*, 998 F.2d 65 (2d Cir. 1993).) The cases on which Mammoth relies to support that position are not only nonprecedential, but also either inapposite or support determining Precision's allegations sufficient at the pleadings stage.

For example, in *Julie Research Laboratories*, the lower court dismissed a trade secret misappropriation claim following a bench trial, concluding that the plaintiff's "combination of system design choices" were "either obvious, widely known, easy for others to discover legitimately or disclosed in the sales literature of [plaintiff] or other manufacturers." 998 F.2d at 67. The Second Circuit affirmed. But as discussed below, Precision alleges facts establishing that its compilation trade secret is neither widely known nor easy for others to discover. In any event, a court's factual findings following trial bear little on whether Precision alleges enough facts in its FAC to state a claim.

By arguing that Precision is attempting to claim trade secret protection over the regulatory process, Mammoth mischaracterizes Precision's FAC, which asserts trade secret protection over the data and documents generated to obtain the STC, not the process itself. Mammoth does not, and likely cannot, argue that the *data* generated by Precision and submitted to the FAA is widely or generally known in the industry. If it were, it would not have taken Precision years or tens of millions of dollars to create it. (FAC ¶¶ 18-19, 36.) *See Esha Rsch.*, 2026 WL 1121951, at *12 (finding plaintiff had adequately alleged a compilation trade secret where database had been "developed through decades of investment in research and development"). Not to mention that more companies would likely hold 757 STCs. (FAC ¶ 22 ("Precision is one of only three companies in the world that holds an STC to convert the 757.").)

Still, Mammoth argues that Precision has not offered any facts to show that the individual components of the 757 STC Data would not be "readily ascertainable" through proper means. (Mammoth MTD, ECF 39 at 16.) But "[e]vidence that a plaintiff spends a 'considerable amount of money and effort in developing the compilation' supports that the compilation may not be readily ascertainable." *Barrett Bus. Servs., Inc. v. Colmenero*, 24-4474, 2025 WL 2048985, at *1 (9th Cir. July 22, 2025) (quoting *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1188 (9th Cir. 2018)); *see also Kaib's Roving*, 237 Or. App. at 102 ("When someone expends considerable time, effort, and expense to compile information, that information in its compiled form can, in some circumstances, meet the statutory definition of a trade secret.").

Even if some of those individual reports were publicly available, that would not be dispositive here. "The Ninth Circuit has recognized that a database consisting of 'an amalgam of public and proprietary source data' that forms 'a massive confidential compilation of data, the

product of years of effort an expense' is protectable as a trade secret." *Corelogic Sols., LLC v. Credifi Corp.*, 820CV01676FLADFMX, 2021 WL 1156860, at *9 (C.D. Cal. Jan. 29, 2021) (quoting *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016), *overruled in part on other grounds by Lagos v. United States*, 584 U.S. 577, 582 (2018)).

Precision spent five years and tens of millions of dollars to obtain its 757 STC. (FAC ¶ 19.) In those five years, Precision employed over 80 engineers and completed testing and analysis for over 11,000 individual aircraft parts. Some bespoke parts were "specially designed, developed, manufactured, and assembled by Precision and its third-party vendors." (FAC ¶¶ 20-21.) When Boeing declined to permit Precision access to its "process and design information," Precision had to acquire its own 757 for "measurements and testing." (FAC ¶ 36.) Precision then used that data to develop its FEM, which it employed to test contemplated changes to the to-be-converted aircraft. (FAC ¶ 39.) Precision adequately pleads that the compilation of 757 STC Data is not readily ascertainable through proper means or generally known to the public or the industry at large.

Precision also "goes through great lengths to keep this compilation of documents" confidential. (FAC ¶¶ 37, 42.) Those efforts include requiring employees to sign confidentiality agreements and handbooks indicating compliance with Precision's Confidentiality Policy and STC Data Policy, as well as requiring suppliers to sign non-disclosure agreements. Precision keeps the STC qualification data "locked down on its server," monitors data downloads, and "only grants access to employees on a need-to-know basis." (FAC ¶ 45.) Finally, Precision marks all of its STC-related documents as proprietary. (FAC ¶ 46.)

Those allegations reflect reasonable efforts undertaken by Precision to preserve the secrecy of its 757 STC Data. *See Extreme Reach, Inc. v. Spotgenie Partners, LLC*, CV1307563DMGJCGX, 2013 WL 12081182, at *4 (C.D. Cal. Nov. 22, 2013) (reasonable efforts included "password protecting [the trade secret], making it available to only certain employees, and protecting it with a firewall"); *Sun Distrib. Co., LLC v. Corbett*, 18-CV-2231-BAS-BGS, 2018 WL 4951966, at *4 (S.D. Cal. Oct. 12, 2018) (having "employees sign employment agreements with provisions to maintain the confidentiality of Trade Secrets [and] [] a security system designed to protect its proprietary, confidential, and trade secret information" sufficient to show reasonable efforts); *Leavitt Great W. Ins. Servs., LLC v. Theriault,* CV 25-24-H-DLC, 2026 WL 926183, at *5 (D. Mont. Apr. 6, 2026) ("requiring employees to sign confidentiality agreements, limiting access to systems and data based on role necessity, requiring individual credentials with regular permission reviews, and implementing policies prohibiting disclosure, mandating return of files and equipment upon termination, and requiring compliance with data protection standards" sufficient).

To that end, Precision plausibly alleges that the compilation of 757 STC Data derives "independent economic value" from being kept secret. "Independent economic value can be shown by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Calendar Rsch. LLC v. StubHub, Inc.*, 2:17-CV-04062-SVW-SS, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017). Discussed already, the FAC describes the resources invested in producing the 757 STC Data and the precautions taken by Precision to protect it as a secret.

Precision also pleads that, as just one of a handful of companies in the world with FAA-approval to convert 757s, "owning an STC can be extremely lucrative." (FAC ¶¶ 22, 37.) STC holders like Precision "can charge millions or tens of millions of dollars for each conversion" or charge *other conversion companies*, like Mammoth, for access to its data set. (*Id.*) Much like a customer list compiled over time, Precision's 757 STC Data "constitute[s] a protected trade secret [because] it includes nonpublic information that provides a substantial business advantage to competitors." *Pollara v. Radiant Logistics, Inc.*, 650 F. App'x 372, 373 (9th Cir. 2016). In sum, the 757 STC Data is well-pleaded as a compilation trade secret.

**b. Precision sufficiently alleges that Mammoth misappropriated the 757 STC Data in violation of the DTSA and OUTSA.**

Under federal and Oregon law, misappropriation includes "acquisition of a trade secret" by a person who knows or should know the secret was improperly acquired or "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5); ORS § 646.461(2). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." ORS § 646.461(1); 18 U.S.C. § 1839(6)(A). To properly plead misappropriation, a plaintiff may rely on any one of three theories of liability: (1) acquisition, (2) disclosure, or (3) use. *Robillard v. Opal Labs, Inc.*, 428 F. Supp. 3d 412, 451-52 (D. Or. 2019).

Mammoth contends that Precision's FAC fails to show improper acquisition, use, or disclosure of the 757 STC Data. Precision must allege, in Mammoth's view, misappropriation of the compilation "as a whole" to survive dismissal. (Mammoth MTD, ECF 39 at 18 (citing *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314 (11th Cir. 2020).) According to

Mammoth, Precision has, at most, shown possession of a handful of documents, and that cannot by itself state a claim. The court disagrees.

Once again Mammoth cites a non-precedential case for the contention that Precision must allege misappropriation of the compilation "as a whole." *See Compulife*, 959 F.3d at 1314 (reversing and remanding dismissal of trade secret misappropriation claim following bench trial). As Precision points out, *Compulife* cuts against what the court understands to be Mammoth's argument—that unless Precision can advance facts demonstrating that Mammoth misappropriated the entire compilation, it cannot state a claim. (Resp., ECF 59 at 20.) *Compulife* noted that, even if individual parts of a database were not protectable trade secrets, the database could still qualify for trade secret protection because "taking enough of [the individual parts] must amount to misappropriation of the underlying secret at some point." 959 F.3d at 1314. To hold otherwise, the court reasoned, would render statutory trade secret protections for compilations hollow. *Compulife* held that, to establish liability, "appropriation of a substantial portion is sufficient." *Id.*; *see also Barrett Bus. Servs., Inc. v. Colmenero*, 1:22-CV-3122-TOR, 2026 WL 313474, at *4 (E.D. Wash. Feb. 5, 2026) ("Where the trade secret is a compilation, use of the information from it piecemeal may still constitute a misappropriation.").

Here, Precision adequately pleads that Mammoth misappropriated a significant portion, if not all, of the 757 STC Data through improper use. Mammoth argues that Precision's allegations are speculative, rather than plausible. But Precision's reliance on circumstantial evidence is not dispositive in the trade secret context, especially not at the pleadings stage. *Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1048 (S.D. Cal. 2017) ("[I]t is not common for a plaintiff to know, prior to discovery, the details surrounding an alleged theft of trade secrets.").

Courts may reasonably infer misappropriation based on ambiguous circumstantial evidence, as "direct evidence of trade secret misappropriation is often hard to come by." *Computer Scis. Corp. v. Computer Assocs. Int'l, Inc.*, CV 98-1374-WMB SHX, 1999 WL 675446, at *12 (C.D. Cal. Aug. 12, 1999). That said, plaintiffs who seek to plead misappropriation based on circumstantial evidence are still bound by the requirements of Rule 8, meaning those allegations must be plausible. *Yeiser*, 281 F. Supp. 3d at 1048.

Precision's allegations of improper use (despite being largely circumstantial) rise above mere speculation. To start, the FAC alleges that at least three documents developed by Precision for the 757 STC have been found on Mammoth's server, all of which pre-date Wagner's separation from Precision and are marked as proprietary Precision documents. (FAC ¶¶ 73-74, 78.) Not only that, but in an email between Mammoth employees, a Mammoth engineer indicated that *all* of the 757 qualification data could be used by Mammoth because Wagner was a part of Mammoth. The Mammoth employee stated that a specific valve was chosen *because* Mammoth "had access to all the qual data." (FAC ¶ 79 (emphasis added).)

Precision also alleges that, in 2024, Mammoth attempted to "scale up" its "757 FEM to approximate a 777 aircraft." (FAC ¶ 72.) The court disagrees with Mammoth that that allegation is conclusory and should be disregarded. When viewed alongside Precision's other allegations, misappropriation of the 757 FEM is plausibly alleged. *See SOAProjects, Inc. v. SCM Microsystems, Inc.*, 10-CV-01773-LHK, 2010 WL 5069832, at *11 (N.D. Cal. Dec. 7, 2010) (allegation that defendants acted in concert to misappropriate plaintiff's trade secrets sufficient to state a claim given other circumstantial allegations); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F.

Supp. 3d 868, 884 (N.D. Cal. 2018) (allegations that defendant was "building upon" plaintiff's technology sufficient to state a claim for use misappropriation).

And Precision alleges that Mammoth knew the Data was "subject to confidentiality restrictions" because Wagner, as well as other Mammoth employees that previously worked at Precision, knew that Precision owned the 757 STC Data. (FAC ¶¶ 82, 102.) That improper use has given Mammoth "unfair benefits and advantages in developing its 777 conversion." (*Id.* ¶ 104.) Precision properly alleges that Mammoth misappropriated the 757 STC Data.

In addition to the compilation of 757 STC Data, Precision asserts that the FEM and the three qualification reports found on Mammoth's servers are protectable as trade secrets. The court finds that Precision sufficiently alleges that Mammoth misappropriated the FEM and the three reports for the same reasons that Precision sufficiently alleged misappropriation of the entirety of the 757 STC Data compilation.

Finally, Mammoth argues that Precision fails to put Mammoth on notice to the contours of its trade secret claims. (Mammoth MTD, ECF 39 at 10-11.) With regards to the 757 STC Data, the court disagrees. Precision focuses its FAC on the testing data for the qualified aircraft parts and the FEM. Precision also provides two examples of qualifying parts reports that were found on Mammoth's servers, both of which were marked as proprietary Precision documents. That is sufficient to alert Mammoth to the scope of potentially misappropriated documents. Although Precision "will have to identify its alleged trade secrets with much greater particularity in order to prevail on this claim, [it] has stated a claim of trade secret misappropriation." *Cinebase Software, Inc. v. Media Guar. Tr., Inc.*, No. C98-1100 FMS, 1998 WL 661465, at *7-8 (N.D. Cal. Sept. 22, 1998) (discussing a trade secret plaintiff's lower burden on a motion to dismiss

compared to motion for summary judgment and holding that plaintiff "identified, albeit in fairly general terms, the categories of trade secrets it seeks to protect and the places where those secrets are found").

**c. Precision does not sufficiently allege that the solenoid block design or any other data related to the A321 Airbus conversion is a misappropriated trade secret.**

As much as Precision asserts that 321 Precision's solenoid block design is a trade secret, or that Mammoth misappropriated that trade secret or any other trade secrets related to the A321 Airbus conversion, Precision fails to state a claim. Precision alleges, albeit generally, that the same confidentiality protocols that apply to its 757 STC Data apply to its Airbus data. (FAC ¶¶ 53-58.) The FAC does advance some facts regarding the time and resources required to obtain the Airbus STC, which took longer and was more expensive than the 757 STC. (FAC ¶ 19.) But Precision does not assert that the A321 Airbus STC data is a compilation trade secret. And the FAC's trade secret misappropriation claim refers exclusively to the 757 STC Data and does not mention the solenoid block design or anything related to the Airbus STC. (FAC ¶¶ 94-111.) At oral argument, Precision asserted that the allegations in the body of the FAC were sufficient to state a trade secret misappropriation claim for the Airbus data and solenoid block design. (Tr. Oral Arg. 51:22–53:3, ECF 72.) The court disagrees.

Precision fails to provide equivalent circumstantial evidence to support a reasonable inference that Mammoth misappropriated any A321 Airbus STC data. That is largely because Wagner left Precision long before Precision began developing its Airbus STC. Precision's strongest pieces of circumstantial evidence to support its claim that Mammoth misappropriated

the 757 STC Data (the "room full of Precision 757 data" found at Wagner's offices and the email between Mammoth employees discussing the 757 "qual data") concern Wagner specifically.

As to the solenoid block design, Precision's misappropriation claim remains thin. Precision alleges that a "solenoid block controlling cargo door sequencing on one of Mammoth's 777 conversions-in-progress bears a striking resemblance to a solenoid block designed by former 321 Precision employee Yan Xu," who now works at Mammoth. (FAC ¶ 84.) Precision asserts that the solenoid block designed by Yan Xu for Precision's A321 conversion project was "first-of-its-kind." (*Id.*) Those circumstantial allegations alone cannot support a reasonable inference that Mammoth misappropriated the solenoid block design, nor are they sufficient to show that Mammoth misappropriated any other A321 Airbus STC data.

**2. Tortious Interference**

Precision also brings a claim for intentional interference with economic relations (IIER) against Mammoth. Precision alleges that, if any of the 757 or Airbus STC data is not a trade secret, Mammoth "unlawfully induced [Wagner] to disclose to and permit use of" Precision's confidential and proprietary information in breach of the Development Agreement. (FAC ¶ 113-17.) Precision pleads that claim in the alternative. Mammoth asserts that Precision's tortious interference claim should be dismissed because it is preempted and if it is not preempted, Precision fails to state a claim.[6] The court agrees with Mammoth that, as currently pleaded, Precision's tortious interference claim falls short.

---

[6] Precision withdrew its conversion claim against Mammoth in its response. (Resp. at 23 n.22.) That claim should be dismissed.

To state a claim for tortious interference, Precision must show (1) the existence of a valid business relationship or expectancy, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to economic relations, and (6) damages. *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 651 (1995). Mammoth challenges the second and fourth elements.

The court agrees with Mammoth that Precision's allegations are conclusory. Precision provides no facts demonstrating that Mammoth affirmatively induced Wagner or Wagner Aeronautical to disclose any of Precision's proprietary information to Mammoth. In its FAC, Precision pleaded that Mammoth and Wagner "agreed and conspired with one another to unlawfully disclose and use Precision's data" and "each gave substantial assistance or encouragement to the other to engage in their own tortious conduct." (FAC ¶¶ 89, 91.) Precision relies on *Thames v. City of Portland*, 2018 WL 2749630, at *15 (D. Or. Mar. 6, 2018), *findings and recommendation adopted*, 2018 WL 2749570 (D. Or. June 7, 2018).

But Precision cannot rely on *Thames*. In that case, to support their IIER claim, the plaintiff alleged several detailed facts about specific actions taken by the individual defendants. *Thames v. City of Portland*, 3:16-CV-01634-PK, 2017 WL 4392044, at 6 (D. Or. Oct. 3, 2017). Plaintiffs' theory of liability was that, although those actions appeared "innocent in isolation," they were "wrongful and actionable in the context of their coordinated effort to advance a conspiracy." *Id.* But in their initial complaint, plaintiff's IIER claim did not mention conspiracy and instead alleged that the *individuals* interfered with plaintiff's business relations. Judge Hernández concluded that without the conspiracy language, plaintiffs "fail[ed] to identify how

any of the acts listed above interfered with an existing professional or business relationship[.]" *Id.* Following dismissal, plaintiffs repleaded their IIER claim and added the conspiracy language. The court determined that sufficient and recommended denial defendants' second motion to dismiss; Judge Hernández adopted that recommendation. *See* 2018 WL 2749570 (D. Or. June 7, 2018).

Here, the FAC says nothing about how Mammoth induced Wagner to interfere with the Development Agreement. Without more, merely alleging that the parties "conspired" is not sufficient to plausibly state a claim for tortious interference under *Iqbal*. *See* 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (citation modified).

Precision's assertion that Mammoth induced previous Precision employees to breach their confidentiality agreement fares no better. Precision rests that allegation on "first of its kind" solenoid block design found on Mammoth' servers and asserts that Mammoth would have "reasonably [known]" that the employee who designed the solenoid block "was required to keep his work for 321 Precision confidential." (FAC ¶¶ 118-19.) But again, Precision does not provide any facts to show Mammoth's affirmative inducement. *See* *AssuredPartners of Or., LLC v. Reese*, 6:22-CV-00673-MC, 2022 WL 18024957, at *5 (D. Or. Dec. 30, 2022) (dismissing IIER claim where plaintiff failed to allege facts showing that defendants affirmatively induced former employees of plaintiff to violate their agreements); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1190 (W.D. Wash. 2019) (same).

Further, merely "recruiting a competitor's employees is not unlawful on its own." *Bombardier*, 383 F. Supp. 3d at 1190. Precision offers no factual allegations to show that Mammoth induced Precision employees to leave and work for Mammoth let alone allegations that Mammoth induced those employees who left to breach their confidentiality agreements. *See Isosceles Holding, LLC v. All. Env't Grp., LLC*, 3:23-cv-01004-AN, 2023 WL 4947866, at *10 (D. Or. Aug. 3, 2023) (finding plaintiff did not have a likelihood of succeeding on its tortious interference claim without evidence of defendant employer's affirmative inducement).

The court also agrees with Mammoth that Precision fails to establish that Mammoth acted with improper means or with an improper purpose. Precision argues that Mammoth's alleged inducement constitutes improper means. (Resp., ECF 59 at 24.) That may be true, but as discussed above, Precision has not plausibly alleged that Mammoth induced Wagner or the previous Precision employees. While Precision's allegations are possible, as currently pleaded, they are not plausible. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). Precision's intentional interference claim should be dismissed without prejudice and with leave to replead. Addressed more fully below, the court declines to reach the parties' preemption arguments for now. *See Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 932 F. Supp. 2d 1181 (D. Or. 2013) (declining to determine whether tortious interference claim was preempted where plaintiff failed to allege sufficient facts to state a claim).

**B. *Wagner's Motion to Dismiss***

Wagner's motion should be granted in part and denied in part. Precision plausibly alleges a trade secret misappropriation claim related to the 757 STC Data, a claim for common law

conversion, and for contractual breach on two of its three theories of liability. Precision fails to sufficiently allege, however, that Wagner breached the Development Agreement through disclosure of Precision Know-How, and Wagner's motion should be granted as to that theory.

**1. Trade Secret Misappropriation**

Wagner asserts that Precision fails to state a claim because it has not identified the allegedly misappropriated trade secrets with sufficient particularity or plausibly alleged that Wagner misappropriated Precision's trade secrets. With the sufficiency of Precision's trade secret allegations already resolved as part of Mammoth's motion to dismiss, discussed *supra*, only Wagner's latter argument requires analysis.

As above, to plausibly allege misappropriation, Precision must show (1) improper acquisition, (2) improper disclosure, or (3) improper use by Wagner. *Robillard*, 428 F. Supp. 3d at 451; *see also* 18 U.S.C. § 1839(5); ORS § 646.461(2). Precision's FAC asserts that Wagner improperly retained and improperly disclosed the 757 STC Data to Mammoth. (FAC ¶ 99.) The court agrees with Wagner that improper retention is not cognizable legal theory under the DTSA or OUTSA. *See Apple Inc. v. Rivos, Inc.*, 5:22-cv-02637-EJD, 2023 WL 5183034, at *7 (N.D. Cal. Aug. 11, 2023) ("[A]llegations that former employees merely possessed or failed to return lawfully acquired information are insufficient by themselves to establish misappropriation or show injury under the DTSA.").

That said, Precision properly alleges improper disclosure. Wagner describes Precision's allegations of improper disclosure as conclusory and, like Mammoth, faults the FAC for its lack of detail. For instance, Wagner argues that Precision's misappropriation claim should fail because the FAC does not "describe how" Wagner transmitted any of the 757 STC Data, or "when it was

transmitted" and "to whom and under what circumstances." (Wagner MTD, ECF 64 at 28.) But Precision provides sufficient circumstantial evidence that, if true, would support a reasonable inference that Wagner improperly disclosed the 757 STC Data to Mammoth. The same circumstantial evidence that established a plausible claim of improper use against Mammoth similarly supports a plausible claim of improper disclosure against Wagner. (*See supra*, section A(1)(b).)

Wagner argues otherwise. Wagner asserts first that Precision's allegation that Wagner had a "room full" of Precision 757 STC Data only shows possession, not acquisition, use, or disclosure. (Wagner MTD, ECF 64 at 29.) Next, Wagner argues that Precision fails to allege that any of those documents were "transmitted, physically or electronically, to Mammoth." (*Id.*) Wagner does not, however, address the email between Mammoth employees in which a Mammoth engineer stated that Mammoth had access to all of Precision's 757 STC qualification data *because* of Wagner. (FAC ¶ 79.) Wagner also does not address the proprietary reports found on Mammoth's servers that pre-date Wagner's departure from Precision. (FAC ¶¶ 74-78.) As with Mammoth, Precision's circumstantial factual allegations are enough to state a trade secret claim against Wagner at the pleadings stage.

**2. Breach of Contract**

Wagner also argues that Precision fails to state a plausible claim for breach of contract. To state a claim, Precision "must [allege] the existence of a contract, its relevant terms, and a breach by defendant that resulted in damage to plaintiff." *Huskey v. Or. Dep't of Corr.*, 373 Or. 270, 275 (2025). Wagner identifies and challenges three theories of breach advanced in Precision's FAC: (1) Wagner's alleged failure to return Precision's Data when requested; (2)

Wagner's alleged disclosure of Precision's Data to Mammoth; and (3) Wagner's disclosure of Precision's Know-How without a valid license to do so.

The Development Agreement requires that, upon Precision's request "at any reasonable time," Wagner must transfer all of Precision's Data to Precision. (Dev. Agreement § 1(b), ECF 32-1 at 1.) Precision alleges that, in 2023, a former Precision employee then working for Mammoth, discovered a "room full" of Precision 757 Data at Wagner's office. Precision requested that Wagner return the documents, but Wagner did not do so. (FAC ¶ 81.) Wagner contends that Precision's request, some 20 years after the execution of the Agreement, did not come at "a reasonable time." (Wagner MTD, ECF 64 at 10.) Wagner relies on two Oregon cases for that proposition, both of which are over 100 years old.

Neither case holds much weight here. In one, the Oregon Supreme Court reasoned that, if a year is, as a matter of law, an unreasonable time for a buyer to delay making a demand for nonperishable product, then five months is an unreasonable length of delay for a perishable product. *See Hurst v. Hill*, 96 Or. 311, 322-23 (1920) (considering challenged jury instructions and finding no reversible error). In the other, the court explained that, although whether a contract has been performed within a reasonable length of time is generally a question of fact for the jury, where the facts are undisputed, it becomes a question of law. *See De Vol v. Citizens' Bank*, 113 Or. 595, 602 (1925) (affirming jury verdict). As Precision correctly notes, both decisions "concerned trial and post-trial issues on a full evidentiary record, . . . were highly specific to the facts presented, and neither involved anything like the facts before this [c]ourt." (Resp., ECF 67 at 25.)

*De Vol* may still be good law, but the facts can hardly be described as undisputed. Wagner has not admitted that Precision made the request, nor admitted that they refused to return the documents. (*See* Wagner MTD, ECF 64 at 10 (referring to Wagner's "supposed failure to transfer the data"); Wagner Reply, ECF 68 at 16 (stating that Wagner's "failure to transfer allegedly valuable data to Precision in 2023 strains credulity").) Indeed, Wagner appears skeptical that there even *is* a "room full" of Precision 757 STC Data to be returned. The court thus declines to resolve the "reasonable time" issue as a matter of law. *See* *Bob Barnes Realty, Inc. v. Moore*, 69 Or. App. 435, 439 (1984) ("Whether any particular period of time is a reasonable one is a question of fact depending on the intent of the parties.").

Wagner also argues that Precision cannot succeed on this theory of breach because it has not sufficiently alleged any resulting damages. But Precision alleges that it requested return of its Data in December 2023 and pleads at least one instance of disclosure in 2024. (*See* Resp., ECF 67 at 24; FAC ¶¶ 85-88.) Wagner does not make any argument in reply. The court finds Precision's damages allegations plausible. For Wagner's failure to return the 757 STC Data, Precision states a claim for breach.

Precision does not, however, respond to Wagner's arguments challenging Precision's other theories of breach. When pressed at oral argument, Precision did not concede those breach claims but only spoke to its second theory—Wagner's unsanctioned disclosure of Precision's proprietary information. (Tr. Oral Arg. 61:14–21, ECF 72.) Precision adequately pleaded that Wagner misappropriated the 757 STC Data through improper disclosure. Those allegations also support a claim for breach on Precision's second theory.

Precision's third theory of breach misses the mark, however. That claim is premised on Wagner's alleged failure to maintain Precision Know-How—that is, intangible property under the Development Agreement—as a trade secret. Precision does not provide any factual allegations to support that assertion and did not respond to Wagner's argument in opposition. Precision thus concedes that argument. *See Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (holding that a plaintiff who "makes a claim" in a complaint "but fails to raise the issue in response to a defendant's motion to dismiss" that claim "has effectively abandoned [that] claim"); *see also Maldonado v. City of Ripon*, 2021 WL 2682163, at *8 (E.D. Cal. June 30, 2021) ("Plaintiff does not address Defendants' arguments regarding punitive damages in his opposition to the motion to dismiss and therefore concedes the arguments."); *Kerrigan v. Allstate Ins. Co.*, 543 F. Supp. 3d 843, 845-46 (C.D. Cal. June 10, 2021) ("Plaintiff also did not oppose and, thus, concedes, Defendants' argument that because Allstate Insurance was not a party to the insurance policy at issue in this action it was improperly named and should be dismissed.").

Precision adequately states a claim for breach on its first and second theories, but not as to its third theory.

**3. Conversion**

Lastly, Precision brings a tort claim for conversion against Wagner for "improperly retain[ing] and fail[ing] to return" Precision's 757 STC Data. (FAC ¶ 99.) Precision pleads that claim in the alternative, "to the extent that the information at issue . . . is found not to constitute trade secrets." (FAC ¶ 123; Resp., ECF 67 at 26 n. 15.) In addition to arguing that Precision's

claim is preempted, Wagner argues that Precision fails to plausibly allege the elements of a conversion claim.

To state a claim under Oregon common law, Precision must plead that Wagner (1) intentionally exercised dominion or control (2) over a chattel (3) which so seriously interfered with the right of Precision to control it that Wagner may justly be required to pay Precision the full value of the chattel. *In re Peterson*, 348 Or. 325, 335 (2010) (quoting Restatement (Second) of Torts § 222A (1965)). Precision must allege that it was "entitled to immediate possession of [the] chattel" at issue. *Willamette Quarries, Inc. v. Wodtli*, 308 Or. 406, 413 (1989) (en banc) (internal quotation marks omitted) (quoting *Artman v. Ray*, 263 Or. 529, 531 (1972)). The central inquiry of the tort is whether Wagner intended to exercise control over the chattel inconsistent with Precision's rights. *K.F. Jacobsen & Co. v. Gaylor*, 947 F. Supp. 2d 1120, 1128 (D. Or. 2013).

Wagner asserts first that Precision has not alleged any facts adequately "tethering" its conversion claim to "understood, identifiable property." (Wagner MTD, ECF 64 at 16.) In essence, Wagner merely reiterates its previous contention that Precision failed to identify its trade secrets with sufficient particularity. That argument has already been rejected by the court. Moreover, the cases cited by Wagner here are distinguishable. For instance, in *Thomas v. Thomas*, the court held that plaintiff's allegations could not support a conversion claim because the complaint referred only to "partnership property" and failed "to identify with any degree of specificity what that property actually entail[ed]." 2015 WL 1467207, at *6 (D. Idaho Mar. 30, 2015); *see also Profade Apparel, LLC v. Rd. Runner Sports, Inc.*, 18CV1254-JAH (MDD), 2020 WL 5230490, at *6 (S.D. Cal. Sept. 2, 2020) (holding the same where complaint only referred to

"property" and did not provide any further specifics). In another case cited by Wagner, an allegation that "confidential [i]nformation, trade secrets, third-party information, and other proprietary information" were converted was too vague to state a claim. *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 929 (N.D. Cal. 2024).

Precision's FAC offers more specificity than those cases—alleging that Wagner converted "documents detailing processes, methods, and qualification and testing data pertaining to Precision's 757 Conversion Program." (FAC ¶ 124.) Without discovery, Precision cannot know the *exact* documents subject to conversion, but it alleges enough in its FAC to clear the threshold to state a claim. *See Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1364 (9th Cir. 1990) ("If the relevant facts are in control of the opposing party, more leeway must be given to make allegations in the early stages of litigation that may not be well-grounded.").

Wagner also argues that Precision cannot show "an intentional exercise of dominion or control" that "so seriously interferes" with its rights that Wagner "may justly be required to pay [Precision] the full value of the chattel." (Wagner MTD, ECF 64 at 16 (citing *In re Conduct of Martin*, 328 Or. 177, 184 (1998)).) Yet Precision alleges that it asked Wagner to return the 757 STC Data, but Wagner failed to do so, and that Wagner unlawfully disclosed that 757 STC Data to Mammoth. (FAC ¶¶ 81-2.) That allegation plausibly demonstrates Wagner's intent to wrongfully exercise dominion over Precision's property inconsistent with Precision's rights and support a plausible claim for conversion. *See Shita*, 2025 WL 507306, at *3-4 (allegations that defendant refused to return trade secret material and attempted to transfer the technology to third parties supported inference that defendants intended to exercise control inconsistent with plaintiff's rights); *Sparkasse Bregenz Bank v. JC-Biomethane, LLC*, 6:16-CV-01199-AA, 2016

WL 6908101, at *3 (D. Or. Nov. 21, 2016) (allegations that defendant accessed, manipulated, used, and shared software without license or permission to do so were sufficient to state a claim). Here, Precision alleges that Wagner disclosed its 757 STC Data "to an unknown number of persons." (FAC ¶ 128.) That disclosure interferes with Precision's right to maintain the 757 STC Data as a secret and receive compensation for it. (*Id.*) Viewing the facts in the light most favorable to Precision, Precision states a claim for conversion and Wagner's motion to dismiss the conversion claim should be denied.

Finally, at oral argument, the court was persuaded by Precision's argument that preemption, in this case, is best left for resolution at summary judgment. (*See* Tr. Oral Arg. 81:22–82:22, ECF 72.) The court therefore defers ruling on Mammoth's and Wagner's preemption arguments.

## CONCLUSION

For the above reasons, Mammoth's and Wagner's motions to dismiss (ECFs 39, 64) should GRANTED IN PART and DENIED IN PART. Mammoth's and Wagner's motions to dismiss Precision's trade secret claims related to the 757 STC should be denied. Mammoth's motion to dismiss Precision's trade secret claims related to the A321 Airbus STC and tortious interference claim should be granted, and those claims should be dismissed without prejudice and with leave to amend. Because Precision abandoned its conversion claim against Mammoth, that claim should be dismissed with prejudice.

Wagner's motion to dismiss Precision's breach of contract claim should be denied as to Precision's first and second theories of breach but granted as to its third theory. Wagner's motion to dismiss Precision's conversion claim should be denied.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within fourteen days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: July 21, 2026

/s/ JEFF ARMISTEAD
JEFF ARMISTEAD
United States Magistrate Judge